State *v.* Gilbreath.

\*STATE *v.* GILBREATH.

(*Nashville.* January 26, 1901.)

1. MURDER. *Facts that support verdict for murder in first degree.*

The facts set out in the Court's opinion are held sufficient to support a verdict for murder in first degree, with death sentence, and to negative the defense of accidental killing of a wife by her husband. (*Post, pp. 503–508.*)

2. NEW TRIAL. *Affidavits for insufficient, when.*

Affidavits afford no ground for new trial, which disclose only matter that would be clearly prejudicial to the applicant on another trial. (*Post, pp. 508–510.*)

---

FROM LINCOLN.

---

Appeal in error from Circuit Court of Lincoln County. M. D. SMALLMAN, J.

W. L. ACUFF and J. W. HOLMAN for Gilbreath.

Attorney-general PICKLE for State.

WILKES, J. Defendant is convicted of murder in the first degree for killing his wife, and sentenced to death, and has appealed. The kill-

---

*The Governor commuted the death sentence to imprisonment for life.—REPORTER.

ing was with a shotgun, and at a church supper, in the presence of a large crowd of negroes, and is not denied. The only defense on the merits is that the killing was accidental, and not intentional. Quite a number of persons were examined who were eyewitnesses of the occurrence, and there is but little conflict in their testimony. It appears that the defendant was under the impression that too intimate relations existed between his wife and one George Johnson, and he was watching them closely. All the parties, Johnson, the defendant and his wife, were present at this church supper. The defendant had his gun with him, and says he was carrying it home from his mother's; that he stopped by the church and set the gun over in a graveyard inclosure outside of the church, and went in, and according to his version saw George promenading around the church with something concealed in his hand which he was shaking at defendant's wife; that while he was looking at George he saw him give defendant's wife some money, which he took to be a quarter. He then went out of the house, got his gun, cocked both barrels, and re-entered the church, holding the gun with the butt under his overcoat, the barrels pointing towards the floor. He immediately thereafter shot George Johnson, who, it appears, was standing at a table talking with Lou Clark, the sister of defendant's wife. The details of this killing do not appear in this

record. The church was crowded, and a stampede for the doors followed immediately on the first shot. The defendant says he tried to escape through the door, but the way was crowded and jammed, and in order to get along he had to dodge and turn his gun from side to side to get by those in his way. He was still carrying it by his side, with the butt under his overcoat, when about the middle of the church some one pointed a pistol at him and fired, the bullet grazing his nose and glancing off his cheek, making a flesh wound. The shock of the bullet striking him caused him to grip his gun, and he felt it jump in his hands, but did not know that any one was shot.

The great weight of evidence is that the pistol shot was after both the other shots. He pressed through the door, and after he got outside he heard some one say that Ella, his wife, was shot. He turned to go back in the house, but some one pointed a pistol in his face, and the door was shut. Defendant says he never saw his wife after he fired the shot at Johnson, and that he was all the while dodging from side to side trying to get out.

This is the substance of his statement. One witness, Bud Briggs, colored, corroborates him in the statement that he turned his gun from side to side when it would strike any one in his way. This witness states that defendant was run-

ning straight towards the door when the gun fired, and did not stop or turn aside; that his face was toward the door, and he did not look at his gun nor at his wife, though she was in front of him, and that the gun was kept at his side and not raised.

There was testimony of several witnesses to the effect that this witness, Briggs, said before the trial that defendant ran through the church after his wife with his gun pointed at her.

Quite a number of witnesses were examined for the State, and virtually agree in their statements that after George Johnson was shot, Ella, defendant's wife, started to run, and defendant started after her and turned his gun toward her; that he kept his gun pointed toward her all the time, and as she went around the crowd defendant turned the gun after her; that she cried out as she ran that she had not done anything, and was not talking to him.

The testimony is uncontradicted that the defendant did not put his gun to his shoulder to take aim, but held it in the direction of his wife, and with the butt under his overcoat and about level with his waist.

This is the testimony, in substance, of six (6) witnesses. Witness Lou Clark adds that defendant waited till no one was in the way before he shot his wife; that she turned from the door because she could not get out, and just at that

State *v*, Gilbreath.

time she was shot. The woman was shot in the thigh, and died in a short while. Witness George Wright is still more specific, and says that the woman turned from the door and ran towards the northeast corner where he was, and the defendant followed her; that she ran in front of him, and took him by the strap of his suspenders and said, "Don't let him kill me!" that defendant started around him, and she then ran behind him, and defendant thereupon stepped back a step so he could get around him, and fired, and that he could not have shot her before on account of the crowd. This witness adds that defendant kept pointing his gun at her as she ran around the crowd toward the door, and when he was between them defendant stepped back so he could shoot her and not hit the witness. On cross-examination this witness gives some confused and inconsistent statements, but in the main reiterates his original statement. He is not corroborated in his statements about the woman running around him and calling on him to protect her, and we can give but little credit to this testimony except so far as corroborated by other witnesses.

The witness, John Harris, states, however, that the defendant kept the gun pointed at her until no one was in the way, and then shot her, and he was holding the gun at the time at arms' length, but does not know whether he was look-

ing at it or not. Nearly all the witnesses state that the woman was shot after she turned from the door and was running up the side of the room.

There was testimony showing that the defendant was very jealous of his wife; that he had mistreated her, and that he had abused her, and been arrested for it, and he had said he would kill her but hated to do so, as she was pregnant. He was morbidly jealous of her, and perhaps not without some grounds.

We have not been able to find any errors in the charge of the Court, and none have been pointed out.

The defendant, as well as several other witnesses, makes affidavits on a motion for a new trial, and it is principally on matters set up in these that a new trial is asked. It appears from the affidavits, and otherwise, that the defendant had two indictments pending against him for murder at the same time. One for killing George Johnson and one for killing his, defendant's, wife. The defendant is a negro, and was not able to employ an attorney to defend him. The Court appointed two young attorneys of the Fayetteville bar to represent him. This was done about ten o'clock in the morning. After consulting with the defendant, at his request they announced ready for trial. While the preliminaries of the trial were being arranged the question was raised which

case would be first tried. The Court announced
that the case involving the killing of the wife
would be first tried. Counsel for the defense
then stated that they had supposed the case for
killing of Johnson would be first tried, and they
had prepared for that, and announced ready in
that, but had not conferred about the other, and
were not ready in that, and had made no prep-
arations in that case. The Court, however, re-
quired the trial to proceed for the killing of the
wife. The affidavits which are introduced on the
motion for a new trial to show what other evi-
dence could be introduced on a second trial are
not important or beneficial to the defendant; in-
deed, they are, with one or two exceptions, preju-
dicial to him, as they set out differences between
defendant and his wife, and illustrate his jealousy,
and thus show a motive for the killing, and
support the theory that the killing was not ac-
cidental, but designed. A part of the testimony
of one witness, Rawlston, might have been bene-
ficial to the defendant, as tending to show that
he loved his wife and treated her well, but the
great weight of the testimony on the trial was
to the contrary. It appears that this witness,
Rawlston, was present at the consultation between
defendant and his counsel before going into trial,
and his testimony could and should have been
given on the original hearing. Indeed, it appears
that a witness in the record called Jim Rawlston,

was examined, and testified substantially as ap-
pears in the affidavit. This same witness, however,
in his affidavit states damaging facts to the effect
that the defendant's wife had attempted to poison
him with glass beat up and put in bread. Other
affidavits tended to show that improper relations
existed between the defendant's wife and George
Johnson. This could not benefit defendant on the
trial of this case. The testimony of Matt Hughes
alone would have been of advantage to defendant
on a ' new trial. We are unable to find any
reversible error in this record, and can see no
good that can result to defendant from a new
trial. The facts are few and simple, · and the
affidavits for a new trial do not show that any
other and further defense can be made than has
been made. We are therefore constrained to affirm
the judgment of the Court below, and it is the
judgment of the law and sentence of this Court
that the defendant, John Gilbreath, be delivered
to the Sheriff of Davidson County, to be by him
safely kept and delivered to the Sheriff of Lin-
coln County, and by him kept until Wednesday,
March 20, 1901, when within legal hours, and
in the manner prescribed by law, he will be
hanged by the neck until he is dead.

---

DISSENTING OPINION.

WILKES, J. Upon the record as presented to

this Court I think the judgment is warranted. I am, however, of opinion that defendant's counsel were forced to go to trial without consultation with their client or their witnesses, and without that deliberation that should characterize a trial involving the life of a citizen. Counsel were young and inexperienced, and had prepared themselves upon one case and were required to go to trial upon the other. The testimony and defenses in the two cases might have been, and probably were, very different, even though the offenses were committed so near to each other in point of time. Defendant's version of the killing that it was accidental, was at least plausible, and made out by testimony was sufficient to reduce the crime to a lower grade of homicide than murder in the first degree, but his defense was not developed along the line of accidental killing, but along lines that would have been applicable to a defense of the other indictment in killing Johnson. It is evident that counsel had considered the case in this view and along this line appropriate to the defense for the killing of George Johnson, but not to a defense for the killing of defendant's wife. It is evident that defendant was insanely jealous of his wife, and had some ground therefor. He thought, no doubt, that he was upholding the sanctity of his marriage relation.

For these reasons, and because the proof does not, in my opinion, exclude the ida of acci-

State *v.* Gilbreath.

dental killing beyond a reasonable doubt, and be-
lieving the case should be more fully developed
along this line, I prefer that defendant be given
another trial, and hence respectfully dissent from
the view of the majority.